UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
LONDON

Eastern District of Kentucky
FILED
MAR 0 8 2006

LESLIE G. WHITMER
CLERK U.S. DISTRICT COURT

CIVIL ACTION NO. 05-259-GWU

MICHAEL PARTIN,                                                      PLAINTIFF,

VS.                       **MEMORANDUM OPINION**

JO ANNE B. BARNHART,
COMMISSIONER OF SOCIAL SECURITY,             DEFENDANT.

## INTRODUCTION

The plaintiff brought this action to obtain judicial review of an administrative denial of his applications for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI). The appeal is currently before the Court on cross-motions for summary judgment.

## APPLICABLE LAW

The Sixth Circuit Court of Appeals has set out the steps applicable to judicial review of Social Security disability benefit cases:

1. Is the claimant currently engaged in substantial gainful activity? If yes, the claimant is not disabled. If no, proceed to Step 2. See 20 C.F.R. 404.1520(b), 416.920(b).

2. Does the claimant have any medically determinable physical or mental impairment(s)? If yes, proceed to Step 3. If no, the claimant is not disabled. See 20 C.F.R. 404.1508, 416.908.

3. Does the claimant have any severe impairment(s)--i.e., any impairment(s) significantly limiting the claimant's physical or mental ability to do basic work activities? If yes, proceed to

1

Partin

> Step 4. If no, the claimant is not disabled. <u>See</u> 20 C.F.R. 404.1520(c), 404.1521, 416.920(c), 461.921.
>
> 4. Can the claimant's severe impairment(s) be expected to result in death or last for a continuous period of at least 12 months? If yes, proceed to Step 5. If no, the claimant is not disabled. <u>See</u> 20 C.F.R. 404.920(d), 416.920(d).
>
> 5. Does the claimant have any impairment or combination of impairments meeting or equaling in severity an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (Listing of Impairments)? If yes, the claimant is disabled. If no, proceed to Step 6. <u>See</u> 20 C.F.R. 404.1520(d), 404.1526(a), 416.920(d), 416.926(a).
>
> 6. Can the claimant, despite his impairment(s), considering his residual functional capacity and the physical and mental demands of the work he has done in the past, still perform this kind of past relevant work? If yes, the claimant was not disabled. If no, proceed to Step 7. <u>See</u> 20 C.F.R. 404.1520(e), 416.920(e).
>
> 7. Can the claimant, despite his impairment(s), considering his residual functional capacity, age, education, and past work experience, do other work--i.e., any other substantial gainful activity which exists in the national economy? If yes, the claimant is not disabled. <u>See</u> 20 C.F.R. 404.1505(a), 404.1520(f)(1), 416.905(a), 416.920(f)(1).

<u>Garner v. Heckler</u>, 745 F.2d 383, 387 (6th Cir. 1984).

Applying this analysis, it must be remembered that the principles pertinent to the judicial review of administrative agency action apply. Review of the Commissioner's decision is limited in scope to determining whether the findings of fact made are supported by substantial evidence. <u>Jones v. Secretary of Health and Human Services</u>, 945 F.2d 1365, 1368-1369 (6th Cir. 1991). This "substantial

2

Partin

evidence" is "such evidence as a reasonable mind shall accept as adequate to support a conclusion;" it is based on the record as a whole and must take into account whatever in the record fairly detracts from its weight. Garner, 745 F.2d at 387.

One of the detracting factors in the administrative decision may be the fact that the Commissioner has improperly failed to accord greater weight to a treating physician than to a doctor to whom the plaintiff was sent for the purpose of gathering information against his disability claim. Bowie v. Secretary, 679 F.2d 654, 656 (6th Cir. 1982). This presumes, of course, that the treating physician's opinion is based on objective medical findings. Cf. Houston v. Secretary of Health and Human Services, 736 F.2d 365, 367 (6th Cir. 1984); King v. Heckler, 742 F.2d 968, 973 (6th Cir. 1984). Opinions of disability from a treating physician are binding on the trier of fact only if they are not contradicted by substantial evidence to the contrary. Hardaway v. Secretary, 823 F.2d 922 (6th Cir. 1987). These have long been well-settled principles within the Circuit. Jones, 945 F.2d at 1370.

Another point to keep in mind is the standard by which the Commissioner may assess allegations of pain. Consideration should be given to all the plaintiff's symptoms including pain, and the extent to which signs and findings confirm these symptoms. 20 C.F.R. Section 404.1529 (1991). However, in evaluating a claimant's allegations of disabling pain:

3

Partin

> First, we examine whether there is objective medical evidence of an underlying medical condition. If there is, we then examine: (1) whether objective medical evidence confirms the severity of the alleged pain arising from the condition; or (2) whether the objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain.

Duncan v. Secretary of Health and Human Services, 801 F.2d 847, 853 (6th Cir. 1986).

Another issue concerns the effect of proof that an impairment may be remedied by treatment. The Sixth Circuit has held that such an impairment will not serve as a basis for the ultimate finding of disability. Harris v. Secretary of Health and Human Services, 756 F.2d 431, 436 n.2 (6th Cir. 1984). However, the same result does not follow if the record is devoid of any evidence that the plaintiff would have regained his residual capacity for work if he had followed his doctor's instructions to do something or if the instructions were merely recommendations. Id. Accord, Johnson v. Secretary of Health and Human Services, 794 F.2d 1106, 1113 (6th Cir. 1986).

In reviewing the record, the Court must work with the medical evidence before it, despite the plaintiff's claims that he was unable to afford extensive medical work-ups. Gooch v. Secretary of Health and Human Services, 833 F.2d 589, 592 (6th Cir. 1987). Further, a failure to seek treatment for a period of time may be a factor to be considered against the plaintiff, Hale v. Secretary of Health and Human Services, 816 F.2d 1078, 1082 (6th Cir. 1987), unless a claimant simply has no way to afford

4

Partin

or obtain treatment to remedy his condition, McKnight v. Sullivan, 927 F.2d 241, 242 (6th Cir. 1990).

Additional information concerning the specific steps in the test is in order.

Step six refers to the ability to return to one's past relevant category of work. Studaway v. Secretary, 815 F.2d 1074, 1076 (6th Cir. 1987). The plaintiff is said to make out a prima facie case by proving that he or she is unable to return to work. Cf. Lashley v. Secretary of Health and Human Services, 708 F.2d 1048, 1053 (6th Cir. 1983). However, both 20 C.F.R. 416.965(a) and 20 C.F.R. 404.1563 provide that an individual with only off-and-on work experience is considered to have had no work experience at all. Thus, jobs held for only a brief tenure may not form the basis of the Commissioner's decision that the plaintiff has not made out its case. Id. at 1053.

Once the case is made, however, if the Commissioner has failed to properly prove that there is work in the national economy which the plaintiff can perform, then an award of benefits may, under certain circumstances, be had. E.g., Faucher v. Secretary of Health and Human Services, 17 F.3d 171 (6th Cir. 1994). One of the ways for the Commissioner to perform this task is through the use of the medical vocational guidelines which appear at 20 C.F.R. Part 404, Subpart P, Appendix 2 and analyze factors such as residual functional capacity, age, education and work experience.

5

Partin

One of the residual functional capacity levels used in the guidelines, called "light" level work, involves lifting no more than twenty pounds at a time with frequent lifting or carrying of objects weighing up to ten pounds; a job is listed in this category if it encompasses a great deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls; by definition, a person capable of this level of activity must have the ability to do substantially all these activities. 20 C.F.R. 404.1567(b). "Sedentary work" is defined as having the capacity to lift no more than ten pounds at a time and occasionally lift or carry small articles and an occasional amount of walking and standing. 20 C.F.R. 404.1567(a), 416.967(a).

However, when a claimant suffers from an impairment "that significantly diminishes his capacity to work, but does not manifest itself as a limitation on strength, for example, where a claimant suffers from a mental illness . . . manipulative restrictions . . . or heightened sensitivity to environmental contaminants . . . rote application of the grid [guidelines] is inappropriate . . ." Abbott v. Sullivan, 905 F.2d 918, 926 (6th Cir. 1990). If this non-exertional impairment is significant, the Commissioner may still use the rules as a framework for decision-making, 20 C.F.R. Part 404, Subpart P, Appendix 2, Rule 200.00(e); however, merely using the term "framework" in the text of the decision is insufficient, if a fair reading of the record reveals that the agency relied entirely on the grid. Ibid. In such cases, the agency may be required to consult a vocational specialist. Damron v. Secretary, 778 F.2d

6

279, 282 (6th Cir. 1985). Even then, substantial evidence to support the Commissioner's decision may be produced through reliance on this expert testimony only if the hypothetical question given to the expert accurately portrays the plaintiff's physical and mental impairments. <u>Varley v. Secretary of Health and Human Services</u>, 820 F.2d 777 (6th Cir. 1987).

## DISCUSSION

The plaintiff, Michael Partin, was found by an Administrative Law Judge (ALJ) to have "severe" impairments consisting of moderate obstructive sleep apnea, moderate facet arthropathy and a very small posterior central annular tear and small protrusion at the L4-5 level, and was status post gunshot wound to the right shoulder with a comminuted right clavicular fracture. (Tr. 18). Nevertheless, based in part on the testimony of a vocational expert (VE), the ALJ determined that Mr. Partin retained the residual functional capacity to perform a significant number of jobs existing in the economy and, therefore, was not entitled to benefits. (Tr. 21-3). The Appeals Council declined to review, and this action followed.

At the administrative hearing, the ALJ had asked the VE whether a person of the plaintiff's younger age, "limited" education, and prior unskilled work experience could perform any jobs if he were limited to light level exertion, and also had the following non-exertional impairments. (Tr. 273). He: (1) would be precluded from any lifting or overhead reaching with his right arm; (2) would be precluded from any crawling or climbing of ladders, ropes, or scaffolds; and (3) due to sleep apnea,

could not work at unprotected heights, around dangerous moving machinery, or perform "any work which could not be safely interrupted." (Tr. 273). The VE responded that there were only sedentary level positions which such a person could perform, including the jobs of security officer and surveillance systems monitor, and proceeded to give the numbers in which they existed in the regional and national economies. (Tr. 274).

On appeal, this Court must determine whether the administrative decision is supported by substantial evidence.

Mr. Partin alleged disability due to loss of use of his right arm and hand after being shot in the right shoulder in January, 2003. (Tr. 66). He also described problems predating a shooting due to falling asleep behind the wheel of machinery he operated in coal mines. (Id.). Other problems included a back injury (Id.). At the administrative hearing, he testified that he could not pick up any weight with his right arm, could not lift the arm over his head, and could not move it around very well. (Tr. 263-4). However, he was occasionally able to drive his manual transmission truck by using his left hand to help the right arm shift. (Tr. 265-6, 268). Despite his earlier testimony that he could not pick up "any" weight, he later stated that he could pick up a gallon of milk with the right arm, but had trouble pouring a full bottle. (Tr. 267). He admitted to being able to pick up a dime from the top of a table, despite a feeling of numbness. (Id.). Mr. Partin also described sleep apnea, which left him tired all the time, despite using a breathing machine with oxygen at night. (Tr. 265). He had

8

fallen asleep on several occasions while driving, and also while operating equipment in his former coal mining job. (Tr. 269-70). He had halved his smoking from three packs per day, but had been unable to quit, despite doctor's advice. (Tr. 266).

Medical records in the transcript include reports of a "trauma admission" at the University of Kentucky Medical Center (UKMC) on January 19, 2003, for what was described as a point blank gunshot wound. (Tr. 128). Right shoulder x-rays showed a comminuted fracture of the right clavicle with adjacent bullet fragment at the base of the right neck, but the bony elements of the shoulder were well aligned. (Tr. 137). He was given secondary diagnoses of brachial plexopathy and soft tissue injury. (Tr. 130). After missing several follow-up appointments, Mr. Partin was again at UK and seen by Dr. Jeff Selby on April 7, 2003, at which time he was complaining of a shooting/burning pain in the shoulder which radiated to the fingertips. (Tr. 178). The examination showed significant atrophy of the right shoulder muscles, and zero degrees of active abduction and flexion of the shoulder. (Id.). Nor could Mr. Partin externally rotate the arm, although he was able to rotate it internally. His clavicle fragment was moving as one piece on palpation of the shoulder, but this was said to be nontender, and sensation to light touch appeared to be intact over the right upper extremity. (Id.). An x-ray revealed a healed clavicular fracture and small scattered foreign objects, presumably gunshot. (Tr. 179). The humerus had been reduced in good position. Dr. Selby's assessment was "status post gunshot wound to the right shoulder with axillary neuropathy." (Id.). Mr. Partin was scheduled for

9

an EMG/NCV test in anticipation of a referral for consideration of nerve graft, and given a nonsteroidal anti-inflammatory drug. (Id.). No specific functional restrictions are suggested, and there is no evidence of any follow-up.

Mr. Partin underwent a consultative physical examination by Dr. Natali Balog on May 24, 2003. (Tr. 180). He claimed that he had been told by his surgeons that there was nothing more to be done with his right shoulder, and was unable to lift anything with the right upper extremity, although he could move his elbow and hand. He also complained of the right shoulder coming in and out of the socket, having decreased feeling in the upper arm, low back pain, and coughing and wheezing. (Tr. 180-1). He smoked a carton of cigarettes a week. (Tr. 180). Dr. Balog noted that as she came to the examination room, Mr. Partin acted as though he could not lift his arm to shake her hand, but then, during the examination, showed her how his elbow bent and his hand moved. (Tr. 181). Examination showed that his right hand grip was reduced to 37 to 45 pounds compared with 95 to 100 pounds on the left, there was decreased sensation over the right shoulder and proximal arm, and she was unable to elicit biceps or brachioradialis reflexes. (Tr. 181-2). Otherwise, deep tendon reflexes were intact, and the patient had no apparent difficulty moving about the room or getting on and off the examination table. (Tr. 182). His range of motion was normal except in the right shoulder, where passive flexion and abduction were reduced to 90 degrees, but there was no pain associated with passive movement, and no evidence of the joint being out of the socket. (Id.). Mr. Partin was able to do

10

some fine manipulations such as buttoning and unbuttoning clothing and picking up coins from a desk. (Id.). Regarding his complaints of back pain, Dr. Balog found a normal range of motion of the spine with no spasms, negative straight leg raising, and no impairment in toe or heel walking. (Id.). An x-ray of the right shoulder showed an old comminuted fracture of the right clavicle with a bullet fragment, but otherwise the shoulder was well aligned and there were no arthritic changes. (Tr. 182-3). Dr. Balog concluded that the plaintiff's gunshot wound to his right shoulder meant that he would be unable to lift with it "greatly," although he could use the hand and elbow on that side with some weakness. (Tr. 183). She concluded that there would be a moderate restriction in his right arm only for reaching, lifting, carrying, or handling objects, and no restrictions for the same items in the left arm. (Id.). A state agency physician who reviewed the record at this point, Dr. Howard Phillips, concluded that the plaintiff would be capable of performing light level exertion, including a limitation to occasional light pushing and pulling with the right arm, never reaching overhead with the right arm, never climbing ladders, ropes, or scaffolds, and occasionally crawling. (Tr. 193-200). He noted that there was no evidence of current difficulty with the use of the right hand, despite the plaintiff's allegations, and, other than a limitation in shoulder motion, there was no obvious impairment in the use of the right upper extremity. (Tr. 202). There was no documentation of a sleep disorder. (Id.). A subsequent state agency reviewer stated that he affirmed the prior

11

findings. (Tr. 184-91). A state agency psychologist indicated that there was no medically determinable mental impairment. (Tr. 204, 216).

Subsequently, the plaintiff submitted some additional evidence, including a worker's compensation "disability certificate" signed by a registered nurse practitioner, Jami Carnes, indicating that he was permanently "100 percent" disabled due to a deformity of his right shoulder. (Tr. 220). The ALJ rejected this opinion as not being supported by objective evidence (Tr. 20), and in addition, the Court notes that it was not given by an acceptable medical source under the Commissioner's regulations. 20 C.F.R. Section 404.1513.

Nurse Carnes apparently participated in Mr. Partin's treatment at the Sleep Disorder Center of London, where an overnight polysomnogram test on April 5, 2004 was interpreted as showing moderate obstructive sleep apnea syndrome. (Tr. 221). He was given a CPAP machine, and a further study was planned to rule out narcolepsy. (Id.). The additional testing was performed in September, 2004, and the "impressions" after the test were narcolepsy, moderate obstructive sleep apnea syndrome, and periodic limb movement disorder. (Tr. 237). The physician recommended an increase in CPAP machine pressure, a "wake-promoting agent such as Provigil" for narcolepsy, and indicated that he "may require" medication for periodic limb movement disorder. (Tr. 238). No functional restrictions are given.

The only other evidence is from Dr. Richard Lingreen, a neurosurgeon, who examined the plaintiff for musculoskeletal complaints. He reviewed prior x-rays of

Partin

the right clavicle, and found that the plaintiff had a reduced range of motion of the neck with no spasms, good reflexes and good grip, and no spasms or reduced range of motion in the lumbar spine. (Tr. 223). He obtained an MRI of the lumbosacral spine which showed a significant loss of normal lordosis, and evidence of a small tear and protrusion at L4-L5, but no neural compression. (Tr. 225). On follow-up, Dr. Lingreen indicated that the plaintiff was being helped somewhat by the physical therapy he had prescribed, and that the medications he had prescribed were alleviating Mr. Partin's pain and allowing him to function. (Tr. 222). No functional restrictions are suggested.

The plaintiff makes two arguments on appeal.

First, he maintains that the restrictions given for use of the right arm were inadequate, but they are consistent with the opinions of the state agency reviewing sources, and Dr. Balog did not specifically restrict the plaintiff to greater extent than found by the ALJ. Therefore, this portion of the decision is supported by substantial evidence.

Second, the plaintiff argues that restrictions due to his diagnosis of narcolepsy were not adequately included in the hypothetical question. Counsel for the plaintiff had asked the VE whether the jobs he had described could be performed by someone who often fell asleep without warning, and the VE had responded that, while the answer would depend on how long and how often, an individual would have to meet certain standards of productivity, and that all jobs require some

13

Partin

alertness. (Tr. 275). The plaintiff argues that the ALJ's restrictions addressed only safety issues, and that the jobs of security guard and surveillance monitor would be inappropriate for an individual who was subject to periods of inattention. Under the circumstances of this case, however, the argument is without merit. While the plaintiff was diagnosed with narcolepsy after his most recent testing, the mere diagnosis of a condition says nothing about its severity. See Young v. Secretary of Health and Human Services, 925 F.2d 146, 151 (6th Cir. 1988). No examining or reviewing sources gave specific restrictions related to the problem.[1]

The decision will be affirmed.

This the ___8___ day of March, 2006.

*signature*
G. WIX UNTHANK
SENIOR JUDGE

---

[1] Moreover, a "wake promoting" medication was suggested by the physician. (Tr. 238). There is no evidence that the plaintiff tried the medication, but the Sixth Circuit has held that a medical condition that is remedial with treatment cannot be considered disabling. Plank v. Secretary of Health and Human Services, 734 F.2d 1174, 1176 (6th Cir. 1984).